Kelly J. HARVOT, Plaintiff-Appellant,

v.

SOLO CUP CO. and
Solo Cup Operating Co.,
Defendants-Respondents.

Supreme Court

*No. 2007AP1396. Oral argument January 6, 2009.*
*—Decided July 17, 2009.*

(On certification from the court of appeals.)

**2009 WI 85**

(Also reported in 768 N.W.2d 176.)

1

For the plaintiff-appellant there were briefs by *Peter J. Culp* and *Dempsey, Williamson, Kelly & Hertel, LLP,* Oshkosh, and oral argument by *Peter J. Culp.*

For the defendants-respondents there was a brief by *John E. Murray, Robert J. Simandl,* and *Simandl & Murray, S.C.,* Waukesha, and oral argument by *John E. Murray.*

¶ 1. DAVID T. PROSSER, J. This case is before the court on certification by the court of appeals, pursuant to Wis. Stat. § 809.61 (2007–08).[1] The issues presented examine whether there is a right to jury trial in a civil action to recover damages under Wisconsin's Family or Medical Leave statute, Wis. Stat. § 103.10.

¶ 2. Subsection (13) of that statute reads in part: "Civil Action. (a) An employee or the [D]epartment [of Workforce Development] may bring an action in circuit court against an employer to recover damages caused by a violation of sub. (11) after the completion of an administrative proceeding, including judicial review, concerning the same violation." Wis. Stat. § 103.10(13)(a).

¶ 3. The court of appeals certifies the following questions: (1) Does the Wisconsin Family or Medical Leave Act (WFMLA) confer an implied statutory right to a jury trial in a civil action for damages? (2) In the alternative, under the test set forth in *Village Food & Liquor Mart v. H&S Petroleum, Inc.,* 2002 WI 92,

---

[1] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

254 Wis. 2d 478, 647 N.W.2d 177, does the Wisconsin State Constitution confer the right to a jury trial in a WFMLA civil action for damages?

¶ 4. We conclude that the WFMLA does not confer an implied statutory right to jury trial in a civil action to recover damages for a violation of the WFMLA. We further conclude that Article I, Section 5 of the Wisconsin Constitution does not afford the right to jury trial in a civil action to recover damages for a violation of the WFMLA. Consequently, we affirm the order of the circuit court.

## I. BACKGROUND AND PROCEDURAL HISTORY

¶ 5. In 1984, Kelly J. Harvot (Harvot) began working for Hoffmaster Solo Cup Co. (Hoffmaster) at its production facility in Oshkosh. The company produces disposable foodservice items such as cups, bowls, plates, napkins, and placemats. Harvot was employed as a full-time stock handler in the shipping department, driving a forklift. During her tenure, she developed a serious and painful back condition that was diagnosed as a cervical disk bulge with moderate to advanced degenerative changes in the lumbar spine.

¶ 6. Harvot's condition worsened in 2005. On January 24, she was treated by Dr. Lynda Kasper (Dr. Kasper) for back spasms and was given mild pain medication. Harvot missed three days of work, which she counted as sick leave.

¶ 7. Harvot was covered by a collective bargaining agreement between Hoffmaster and Harvot's union. Under the agreement, union employees were entitled to six days of sick leave per year. These sick days were not reduced when an employee took approved medical leave under the WFMLA. Company approval of medical leave

under the WFMLA was important because unapproved medical leave amounted to an attendance violation after the six days of authorized sick leave had been exhausted. Hoffmaster's attendance policy provided for progressive discipline, up to and including discharge at the fourth attendance violation.

¶ 8. By October 2004, Harvot was subject to discharge for any further attendance violation, including unapproved medical leave.

¶ 9. In May 2005, Harvot again sought treatment from Dr. Kasper for her back condition. Dr. Kasper prescribed two pain medications and directed Harvot to a pain clinic for further treatment. Dr. Kasper retained supervision and responsibility for Harvot's treatment and medication. Because of her condition, Harvot missed work on May 3, 4, and 5. By May 3, she had only two days of sick leave remaining under the collective bargaining agreement. For her May 5 absence, Harvot submitted a medical leave request under the WFMLA. The request for leave was denied because it was filed more than 15 days after her absence, making the request untimely under company policy.

¶ 10. Nonetheless, Harvot put Hoffmaster on notice of her health condition when she filed the request for an approved leave for May 5 because she included a Health Care Provider Certification signed by Dr. Kasper. In the certification, Dr. Kasper listed the May 3–5 treatment dates and indicated that the treatment was "ongoing." Dr. Kasper also stated that Harvot's condition would require intermittent periods of absence that should be considered medically necessary.

¶ 11. On June 8, 2005, Harvot submitted a request for leave for June 22, because she was scheduled to receive an epidural injection from the pain clinic that day. For this request, she submitted another Health

6

Care Provider Certification, signed by Dr. Kasper, which verified that her appointment for the injection was medically necessary. On June 10, Hoffmaster approved the request.

¶ 12. Harvot was absent from work again on June 11, 2005. Later in the month she requested leave for this absence by submitting another Health Care Provider Certification. Dr. Kasper signed the certification and indicated that Harvot's June 11 absence was due to her medical condition. Dr. Kasper made this representation by relying on Harvot's description of her symptoms and her previous treatment history, but Harvot did not go to Dr. Kasper's office for examination. On July 1, Hoffmaster approved the June 11 leave request.

¶ 13. Harvot was absent from work on June 22 for the epidural injection, as previously approved. She was absent on July 25, August 1, and August 2 as a result of her health condition. She also was absent on July 26 as the result of a previously scheduled vacation day. On July 25, Harvot spoke with a nurse at Dr. Kasper's office who, in turn, consulted with Dr. Kasper. Dr. Kasper ordered a refill for one of Harvot's medications, but she did not think it necessary to examine Harvot at that time. On August 1, 2005, Harvot again spoke with a nurse at Dr. Kasper's office and complained of severe lower back pain and the inability to get up or roll over in bed. Dr. Kasper, again thinking it unnecessary for a physical examination, reviewed the information and ordered a stronger pain medication for Harvot.

¶ 14. Harvot timely requested WFMLA leave for her July 25, August 1, and August 2, 2005 absences. She submitted a medical release authorization, which is a standard form Hoffmaster requires whenever leave is requested. Hoffmaster never used the authorization to

7

contact Dr. Kasper or any of Harvot's other medical providers to obtain more information related to her absences.

¶ 15. In addition to the medical release authorization, Harvot submitted another Health Care Provider Certification on August 12 that was signed by Dr. Kasper. In the certification, Dr. Kasper noted that Harvot's last office visit was on June 13, 2005, that Harvot's work absences were taken on an emergency basis, and that Harvot's condition would require her to be absent from work for "separate blocks of time." Dr. Kasper also attempted to contact Hoffmaster in regard to Harvot's condition, but her call was never returned.

¶ 16. On August 15, 2005, upon arriving at work, Harvot was informed that her leave request for July 25, August 1, and August 2 was being denied and that she was being terminated for a fourth violation of the company's attendance policy. On August 17, Harvot received a memorandum from Hoffmaster officially informing her of its decision to deny her leave request for those three days. The memorandum indicated that the denial was based, at least in part, on the fact that Harvot had not been examined by Dr. Kasper on or around the dates she requested for leave. Harvot contacted Hoffmaster regarding the memorandum and was given the opportunity to present additional information to show that her absences were related to an ongoing medical condition. Evidence suggests, however, that Hoffmaster was not completely forthcoming in advising Harvot what deficiencies in her request materials it wanted her to correct.

¶ 17. Harvot quickly submitted copies of her medical records and a letter from her treating physician at the pain management clinic. Hoffmaster refused to accept this information because it did not indicate that

8

Harvot went to see a doctor on or around the days she was absent. As a result, Harvot was terminated from her employment.

¶ 18. On September 1, 2005, Harvot filed a complaint with the Equal Rights Division of the Wisconsin Department of Workforce Development (the DWD). The complaint alleged that Hoffmaster violated the WFMLA by denying Harvot's leave request for her July 25, August 1, and August 2 absences. A hearing was held on December 20, 2005, and was continued on February 27, 2006, before Administrative Law Judge Larry R. Jakubowski. On November 3, 2006, Judge Jakubowski issued his decision and made the following conclusions of law:

> [Hoffmaster] discriminated against [Harvot] by interfering with, restraining, or denying her the exercise of a right provided under the [WFMLA] by denying her Medical Leave for the absences on July 25, August 1, and August 2, 2005[,] and by assessing her penalties under the attendance policy and by terminating her employment under its attendance policy for the absences from work on those dates.

*Harvot v. Hoffmaster Solo Cup Co.*, ERD No. 200503272 (DWD, Nov. 3, 2006).

¶ 19. Accordingly, Judge Jakubowski ordered that Hoffmaster complete the following tasks: (1) cease and desist from further discrimination and give training to those employees responsible for administering WFMLA requests; (2) amend its records to reflect that Harvot was on medical leave under the WFMLA on the three days at issue; (3) remove the fourth attendance violation from Harvot's records and make a written offer of reinstatement to Harvot, guaranteeing her seniority upon return; (4) make Harvot "whole for all lost wages and benefits incurred as a result of its unlawful dis-

9

crimination," and reimburse Harvot for the interest on such damages at the annual rate of 12 percent; (5) reimburse Harvot for reasonable attorney fees and costs, which were calculated to be $14,381.35; and (6) submit a compliance order to the DWD "detailing the actions that it has taken to comply with" Judge Jakubowski's decision and order. *Id.*

¶ 20. On November 20, 2006, Hoffmaster sought judicial review of the administrative decision and order under Wis. Stat. § 227.53. The petition for review was filed in Winnebago County Circuit Court. On January 4, 2007, however, Hoffmaster filed a request for voluntary dismissal, and Winnebago County Circuit Judge Scott Woldt entered an order for voluntary dismissal.

¶ 21. Harvot subsequently filed suit in Winnebago County Circuit Court pursuant to Wis. Stat. § 103.10(13)(a), which as noted above, provides a private right of action against an employer to recover damages that are caused by violation of the WFMLA.[2]

¶ 22. In her complaint, Harvot recited the outcome of the administrative proceeding and discussed

---

[2] (13) CIVIL ACTION. (a) An employee or the department may bring an action in circuit court against an employer to recover damages caused by a violation of sub. (11) after the completion of an administrative proceeding, including judicial review, concerning the same violation.

(b) An action under par. (a) shall be commenced within the later of the following periods, or be barred:

1. Within 60 days from the completion of an administrative proceeding, including judicial review, concerning the same violation.

2. Twelve months after the violation occurred, or the department or employee should reasonably have known that the violation occurred.

Wis. Stat. § 103.10(13).

the same allegations she made against Hoffmaster in the administrative action. She demanded a judgment against Hoffmaster for the following alleged damages suffered as a result of the WFMLA violations: (1) an award of compensatory damages; (2) an award of punitive damages; (3) "an award of pre- and post-judgment interest at the maximum legal rate"; (4) an award of costs, disbursements, and attorney fees; and (5) an award of "such other and further relief this [c]ourt may deem just and equitable."[3]

¶ 23. Harvot also demanded that her damages claim be heard by a jury.

¶ 24. On March 6, 2007, Hoffmaster filed its answer. It acknowledged generally that the factual allegations in the complaint were true and that the allegations regarding the legal violations of the WFMLA also were true. Hoffmaster, however, denied that interest, attorney fees, or equitable relief were available for Harvot's claim. It also asserted an affirmative defense and argued that the damages sought in the legal action were already awarded to Harvot in the administrative action, and "[t]herefore, she may not recover any damages for these amounts in the present action." To support this argument, Hoffmaster cited *Butzlaff v. Wisconsin Department of Health and Family Services*, 223 Wis. 2d 673, 590 N.W.2d 9 (Ct. App. 1998).

¶ 25. Hoffmaster also filed a motion to strike Harvot's jury request, claiming that the WFMLA does not create a right to a jury trial and that no right exists

---

[3] During oral argument to this court, when asked to describe what damages Harvot is seeking in the civil action considering that she was "made whole" by the administrative action, her attorney responded that she would be seeking compensatory damages for past and future pain and suffering and possibly punitive sanctions against Hoffmaster.

by virtue of Article I, Section 5 of the Wisconsin Constitution. In its supporting brief, Hoffmaster argued that no right to a jury trial exists in the statute, and therefore, if Harvot does have that right, it must be found in the Wisconsin Constitution. Hoffmaster contended that Harvot's claim did not exist at common law in 1848 and therefore did not satisfy the test this court set out in *Village Food*. It summarized its position as follows: "The WFMLA creates new rights for employees which did not exist under the common law 160 years ago. In 1848, employees had no common law right to protected leave for family or medical emergencies. They also had no common law right to challenge a discharge which violated Wisconsin's public policy." Therefore, Hoffmaster concluded, Harvot did not have a constitutionally based right to a jury trial.

¶ 26. Harvot carefully briefed her response to Hoffmaster's motion. Her arguments are discussed *infra*.

¶ 27. Hoffmaster's motion to strike Harvot's demand for a jury trial was heard on June 8, 2007, before Winnebago County Circuit Judge Karen L. Seifert. Judge Seifert granted the motion, stating as follows: "Both sides did a wonderful job of arguing the case; but based on the review and the arguments you made today, I don't find that the statute expressly allows a jury trial. I'm not convinced that there is an implied right to it."

¶ 28. Judge Seifert also rejected Harvot's constitutional argument saying that she did not find anything in common law at the time the Wisconsin Constitution was adopted that was "anywhere close to the case at hand." Judge Seifert set forth her decision in an order on June 15, 2007.

¶ 29. Harvot filed a petition for leave to appeal the circuit court's order. On July 11, 2007, the court of

appeals granted the motion "to address an issue of first impression and one involving the right to a jury trial." Thereafter, the court of appeals certified two issues to this court with the following explanation:

> Whether the WFMLA creates an implied right to a jury trial is a novel and important question. This is particularly pressing because the federal FMLA cases demonstrate that jury trials are often afforded. In the alternative, whether the WFMLA is an essential counterpart to common law labor standards and employment law has never been addressed. A decision by the supreme court will develop and clarify the law, assuring that the constitutional right to a jury trial is not inconsistently interpreted. A pronouncement of the law in this regard will have widespread impact on WFMLA actions throughout the state. For these reasons, we respectfully request that the supreme court accept certification of the issue.

¶ 30. On August 15, 2008, we accepted the following issues certified by the court of appeals:

> 1. Does the . . . WFMLA, Wis. Stat. § 103.10, confer an implied statutory right to a jury trial in a civil action for damages?

> 2. In the alternative, under the test set forth in *Village Food*[], does the Wisconsin State Constitution confer the right to a jury trial in a WFMLA civil action for damages?

## II. STANDARD OF REVIEW

¶ 31. We review both issues presented in this appeal de novo. First, deciding whether the WFMLA "confer[s] an implied statutory right to a jury trial in a civil action for damages" requires that we interpret Wis. Stat. § 103.10. Statutory interpretation presents a question of law that we review de novo. *Minuteman, Inc. v. Alexander,* 147 Wis. 2d 842, 853, 434 N.W.2d 773 (1989).

13

¶ 32. Second, deciding "[w]hether there is a constitutionally guaranteed right to a jury trial for a particular cause of action requires us to interpret a provision of the state constitution, which we do independently of the lower courts." *Village Food,* 254 Wis. 2d 478, ¶ 7 (citing *State v. City of Oak Creek,* 2000 WI 9, ¶ 18, 232 Wis. 2d 612, 605 N.W.2d 526).

### III. DISCUSSION

¶ 33. Harvot argues that the circuit court's decision was erroneous for two reasons: first, the structure of the WFMLA implicitly signifies the legislature's intent to provide a jury trial for civil litigants pursuing damages under Wis. Stat. § 103.10(13); second, Article I, Section 5 of the Wisconsin Constitution preserves a litigant's jury trial right in a civil action for damages under the WFMLA.

¶ 34. We will discuss these arguments in turn after examining the WFMLA.

A. Employee Rights Under the WFMLA

¶ 35. The Wisconsin Family or Medical Leave Act was adopted by the legislature in 1988 and took effect on April 26 of that year. 1987 Wis. Act 287. It has been amended several times since its adoption. The WFMLA preceded the federal Family and Medical Leave Act (FMLA), which was enacted on February 5, 1993, with an effective date of August 5, 1993. *See* The Family and Medical Leave Act of 1993, Pub. L. No. 103-3, 107 Stat. 6.

¶ 36. Wisconsin employees who have "been employed by the same employer for more than 52 consecutive weeks and who worked for the employer for at least

14

1,000 hours during the preceding 52–week period," Wis. Stat. § 103.10(2)(c), are eligible to take defined amounts of unpaid leave time each year for either family or medical leave,[4] *see* Wis. Stat. § 103.10(3)-(4). If an eligible employee takes leave, she is entitled to her previous position, or an equivalent position, upon returning to work, including restoration of benefits and seniority. *See* Wis. Stat. § 103.10(8)-(9).

¶ 37. "No person may interfere with, restrain or deny the exercise of any right provided under" the WFMLA. Wis. Stat. § 103.10(11)(a). If an employee's WFMLA rights are violated, she may file a complaint with the DWD within 30 days. *See* Wis. Stat. § 103.10(12)(b). The DWD must investigate the com-

---

[4] An employee may take *family leave* for any of the following three reasons: (1) "The birth of the employee's natural child, if the leave begins within 16 weeks of the child's birth"; (2) "The placement of a child with the employee for adoption or as a precondition to adoption under s. 48.90(2), but not both, if the leave begins within 16 weeks of the child's placement"; and (3) "To care for the employee's child, spouse or parent, if the child, spouse or parent has a serious health condition." Wis. Stat. § 103.10(3)(b). The employee must schedule leave time with his employer "after reasonably considering the needs of his or her employer." Wis. Stat. § 103.10(3)(c).

An employee also may schedule *medical leave* time "as medically necessary," Wis. Stat. § 103.10(4)(c), if the employee "has a *serious health condition which makes the employee unable to perform his or her employment duties,*" Wis. Stat. § 103.10(4)(a) (emphasis added).

As used in both subsections, " '[s]erious health condition' means a disabling physical or mental illness, injury, impairment or condition involving any of the following: 1. Inpatient care in a hospital, . . . nursing home, . . . or hospice. 2. Outpatient care that requires continuing treatment or supervision by a health care provider." Wis. Stat. § 103.10(1)(g).

plaint and attempt to resolve the matter with the parties. *Id.* If the matter is not resolved and the DWD finds probable cause for a violation, a hearing will be held within 60 days of the DWD's receipt of the complaint. *Id.* The DWD is directed to issue its decision and order within 30 days after the hearing. Wis. Stat. § 103.10(12)(d).

¶ 38. If the DWD decides that the employer violated an employee's rights under the WFMLA, it may "order the employer to take action to remedy the violation, including providing requested family leave or medical leave, reinstating an employee, providing back pay accrued not more than 2 years before the complaint was filed and paying reasonable actual attorney fees to the complainant." *Id.*

¶ 39. Within 60 days of the completion of the administrative action, including judicial review of that action, either the complainant or the DWD may bring a civil action in circuit court against the employer to recover damages caused by the same WFMLA violation that was established previously in the administrative proceeding. *See* Wis. Stat. § 103.10(13).

B. Claimed Statutory Right to Jury Trial

¶ 40. There is no explicit statutory right to a jury trial for civil actions under § 103.10(13). This is acknowledged by Harvot. She claims, however, that "[e]ven though the legislature did not expressly provide for a jury trial right in the actual words of the WFMLA, they created such right *sub silentio.*"

¶ 41. Harvot makes several arguments to support this proposition. First, unlike many Wisconsin statutes, the WFMLA does not expressly limit a civil litigant to a

16

bench trial. Harvot cites several provisions scattered throughout the Wisconsin Statutes that explicitly require the circuit court to hear the matter "without a jury." *See, e.g.,* Wis. Stat. §§ 5.90(3), 9.01(7)(b), 62.50(21), 66.1337(4)(b), 76.08(1), 125.12(2)(d), 174.11(2)(d), 227.57(1), 289.95(2)(c), 302.114(5)(b), 801.08(1), and 971.14(4)(b).[5] Harvot asserts that, because there is no express limitation on the right to a jury in the WFMLA, "one can reasonably infer that the legislature intended for a damages action under Wis. Stat. § 103.10(13) to be triable to a jury."

¶ 42. Second, Harvot reasons that such an inference may be drawn from the "remedial scheme of the WFMLA," which "provides sufficient indicia of legislative intent on the mode of trial in a civil damages action under the WFMLA." She points to the statute's distinction between the availability of equitable relief under Wis. Stat. § 103.10(12)(d) and the availability of legal damages under Wis. Stat. § 103.10(13). According to Harvot, the distinction "provides material insight into the legislature's intent to furnish the right to a jury trial in a civil action for damages under the WFMLA."

¶ 43. Harvot supports her reading of the statute by relying on federal court interpretations of the federal FMLA. Harvot claims that, although the federal FMLA does not contain an express jury trial right, "virtually every federal court that has examined the . . . issue under the federal counterpart of the WFMLA has favored Harvot's position." She points especially to the holding of the Sixth Circuit Court of Appeals in *Frizzell v. Southwest Motor Freight,* 154 F.3d 641, 642–43 (6th

---

[5] To illustrate, Wis. Stat. § 227.57(1), relative to judicial review under the Administrative Procedures Act, provides that review "shall be conducted by the court without a jury."

Cir. 1998), which found an implied right to a jury trial under the federal FMLA. The Sixth Circuit made its decision, according to Harvot, based upon "the structure of the federal FMLA's remedial provisions that provide for 'damages' and additionally for 'equitable relief.'" Harvot relies upon the following statement from *Frizzell:* "[T]he structure of the FMLA's remedial provisions indicates that Congress intended to create a right to a jury. . . . The distinction between 'damages' and 'equitable relief' reflects Congress's intent to make juries available to plaintiffs pursuing remedies [for 'damages'] . . . ." *Id.* at 643.

¶ 44. Third, Harvot claims that Wisconsin tribunals have relied on this same distinction to determine whether there is a right to a jury trial under Wisconsin's Open Housing Act. Her argument is that in *Metropolitan Milwaukee Fair Housing Council v. Goetsch,* ERD No. 9051656 (LIRC, Dec. 6, 1991), the Labor & Industry Review Commission (LIRC) refused to award the Metropolitan Milwaukee Fair Housing Council compensatory damages because of concern that "an administrative tribunal [awarding] legal damages without a jury could abridge a party's constitutional right to a jury trial." She then notes that, after *Goetsch,* the legislature amended the Open Housing Act to make available both an administrative action under Wis. Stat. § 106.50(6) and a civil action under Wis. Stat. § 106.50(6m). Harvot quotes the following passage from *Humphrey v. Comfort Inn,* ERD No. 9203044 (LIRC, Sept. 6, 1994) to illustrate how LIRC interpreted the legislation:

> After a charge is filed under the amended Open Housing Act *either party may elect to have the claims asserted in that charge decided in a civil action* in lieu of an

administrative hearing. Therefore, *the parties are guaranteed a right to trial by jury and may obtain such a trial. . . .*

(Emphasis added by Harvot.) Harvot concludes that "[i]f parties are guaranteed a jury trial in Open Housing claims based on the remedial statutory scheme that almost mirrors that of the WFMLA, so too should parties to WFMLA claims."

██

¶ 45. We are not persuaded by these arguments. The statute is silent on a party's right to a jury trial under Wis. Stat. § 103.10(13). A judicial determination that a party has a *constitutional* right to a jury trial in a civil action is quite different from a judicial determination that the Wisconsin Legislature intended such a right but inadvertently neglected to provide it in the statute.

██

¶ 46. The court has held that, "[f]or new statutory schemes, the legislature retains the flexibility to create an appropriate fact-finding procedure—including the right to a jury trial—if the legislature finds it appropriate." *Village Food,* 254 Wis. 2d 478, ¶ 14 (citation omitted); *see also Bergren v. Staples,* 263 Wis. 477, 483, 57 N.W.2d 714 (1953) ("[I]t is competent for the legislature when it provides a new remedy, to prescribe the procedure by which the remedy may be enforced."); *Bentley v. Davidson,* 74 Wis. 420, 424, 43 N.W. 139 (1889) ("It is competent for the legislature, when it gives a new remedy, to prescribe the procedure by which the remedy may be enforced. It may prescribe a purely equitable or a purely legal procedure, or it may blend the two . . . ."). Unless it is somehow constrained by the constitution, the legislature is free to choose whether a

19

statutory cause of action is subject to a jury trial. *See Village Food*, 254 Wis. 2d 478, ¶ 14. For more than 20 years, the legislature has not done so with respect to WFMLA damages claim.

¶ 47. Our precedent suggests that, when a statute is silent with regard to the right to a jury trial, no jury trial is required unless the right is preserved by Article I, Section 5 of the Wisconsin Constitution. *See id.,* ¶¶ 13–14; *Bekkedal v. City of Viroqua*, 183 Wis. 176, 192–93, 196 N.W. 879 (1924); *State v. Ameritech Corp.*, 185 Wis. 2d 686, 698, 517 N.W.2d 705 (Ct. App. 1994).

¶ 48. In *Bekkedal,* after determining that the constitution did not preserve the right to a jury trial in a dispute involving tax assessments by a municipality, the court stated that *"unless the statute itself makes provision for a jury trial, the parties are not entitled thereto." Bekkedal,* 183 Wis. at 192 (emphasis added).[6]

¶ 49. This principle was reaffirmed in *Ameritech,* where the court of appeals stated the following:

> [T]here is no dispute that in 1848, the State had no right to commence a civil suit to collect forfeitures for deceptive advertising or violation of the [Wisconsin Consumer Act]. Thus, *any right to a jury trial would be by legislative grant rather than constitutionally protected.* But as the State concedes, *neither [statute]*

---

[6] *Bekkedal v. City of Viroqua*, 183 Wis. 176, 192, 196 N.W. 879 (1924) cited *Stilwell v. Kellogg,* 14 Wis. 499 (*461), 504 (*465) (1861), where the court made the following statement:

> The constitution provides that the "right of trial by jury shall *remain* inviolate," which evidently had reference to the condition of the law as it existed when the constitution was adopted. It, therefore, did not preserve it as a matter of right, in those cases which, by the law and practice then existing, were submitted entirely to the judgment of the court.

(Citation omitted.)

> *specifically provides for a jury trial* to determine a party's liability. *Nor are there any references to [the pertinent statutes] in any procedural statutes which permit parties to request a jury.* Therefore, we conclude that the trial court correctly granted Ameritech's motion to strike the demand for a jury.

*Ameritech,* 185 Wis. 2d at 698 (emphasis added). Similarly, *Village Food* implies that, whenever a statute "is silent with respect to the right of a jury trial," we turn to the constitution and the *Village Food* test governs. *Cf. Village Food,* 254 Wis. 2d 478, ¶¶ 12–14 (noting that its "test will not result in affording the right to a jury trial in *all statutory actions in which the legislature is silent with respect to the right of a jury trial*") (emphasis added).

¶ 50. Asking this court to discover an implied *statutory* right to trial by jury in situations where the legislature has not prescribed such a right and where the constitution does not afford such a right would open a can of worms. Statutes vary widely. Ad hoc judicial discovery of implied *statutory* rights to trial by jury would not yield a meaningful legal test that could carry over from case to case. It would instead invite ad hoc argument whenever the statutes are silent. This would not be desirable. If the legislature wants to provide a *right* to trial by jury in new causes of action, it has broad power to do so.

¶ 51. Even if we were to entertain the notion of an implied statutory right, we would easily distinguish the *Frizzell* case interpreting federal law. The *Frizzell* decision is distinguishable because the federal FMLA is distinguishable from the WFMLA. The *Frizzell* decision explains that an employee who violates 29 U.S.C. § 2615 (2006)[7] shall be liable to any eligible employer affected:

---

[7] All subsequent references to the United States Code are to the 2006 version unless otherwise indicated.

21

 A. for damages . . . and

 B. for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

29 U.S.C. § 2617(a)(1).

¶ 52. Subsection (a)(2) then provides the following:

> An action to recover the damages *or* equitable relief prescribed in paragraph (1) may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of—
>
> (A) the employees; or
>
> (B) the employees and other employees similarly situated.

29 U.S.C. § 2617(a)(2) (emphasis added).

¶ 53. *Frizzell* observes, "The distinction between 'damages' and 'equitable relief' reflects Congress's intent to make juries available to plaintiffs pursuing remedies that fall under section 2617[(a)](1)(A) [namely, damages], while leaving it to the judge to determine whether equitable relief is warranted under section 2617[(a)](1)(B)." *Frizzell,* 154 F.3d at 643.

¶ 54. There are three major distinctions between the FMLA under federal law and the WFMLA under state law. First, the Seventh Amendment has been more broadly interpreted than Article I, Section 5 of the Wisconsin Constitution in cases involving statutory rights and claims. In *Curtis v. Loether,* 415 U.S. 189, 194 (1974), the Supreme Court held that "[t]he Seventh Amendment [right to civil jury trial] does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and

22

remedies, enforceable in an action for damages in the ordinary courts of law." *See also Lorillard v. Pons,* 434 U.S. 575, 583 (1978); *Grayson v. Wickes Corp.,* 607 F.2d 1194, 1196 (7th Cir. 1979). This broad interpretation of the Seventh Amendment colors the interpretation of federal statutes.

¶ 55. Second, while a plaintiff-employee under the federal FMLA may file an action to recover damages "in any Federal or State court of competent jurisdiction," 29 U.S.C. § 2617(a)(2), a defendant-employer will have a right to *litigate* the threshold question of whether it violated 29 U.S.C. § 2615.[8] Under Wis. Stat. § 103.10, a Wisconsin employer has no right to ask a jury to determine whether it violated the WFMLA. Thus, under the FMLA, the right to trial by jury is valuable to both employers and employees; under the WFMLA, the right to trial by jury would largely benefit employees, as employers would be defendants in damage-suit jury trials where their liability had already been determined administratively.

¶ 56. Third, 29 U.S.C. § 2617(a)(1)(A) *specifies* what damages are available to employees. Consequential damages are not available,[9] and punitive damages

---

[8] *See, e.g.,* Seventh Circuit Proposed Pattern Family and Medical Leave Act Jury Instructions, 2.a. (2008) ("This instruction (or a variant of it) is intended to cover cases in which the plaintiff's right to FMLA leave is alleged to have been denied or otherwise interfered with."); Eleventh Circuit Pattern Jury Instructions (Civil Cases), § 1.8.1 Substantive Claims and Retaliation Claims, at 180 (2005) ("In this case the Plaintiff claims that the Defendant violated a federal law known as the Family and Medical Leave Act. . . . The Defendant denies that it violated the Act in any way and asserts that [*describe the Defendant's theory of defense*].") (bracketed language in original).

[9] *Harley v. Health Ctr. of Coconut Creek, Inc.,* 518 F. Supp. 2d 1364 (S.D. Fla. 2007); *Johnson v. Georgia Television Co.,*

are not available.[10] In Wisconsin, it is not entirely clear what "damages caused by a violation of sub. (11)" means, and what limitations on damages, if any, may apply.

¶ 57.　Thus, if Harvot is entitled to seek consequential and punitive damages in state court, she will be seeking damages that she would not be entitled to seek under the federal FMLA. A jury would be asked to decide on those damages *after* Hoffmaster's violation had been determined and *after* substantial damages had already been awarded. *See supra,* ¶¶ 18–19, 21–22.

¶ 58.　Harvot has not pointed to any legislative history in Wisconsin that supports legislative contemplation of a right to jury trial. This contrasts with the legislative history of the federal FMLA. *See Frizzell,* 154 F.3d at 644. We also note that the state and its municipalities are covered by the WFMLA. *See Butzlaff,* 223 Wis. 2d at 682–83. Thus, we think it somewhat unlikely that the legislature *intended* to give juries the right to impose punitive damages for WFMLA violations against the state and other Wisconsin governments.

¶ 59.　Harvot's reliance on the Open Housing Statute works against her as well. Wisconsin Stat. § 106.50(6m)(a) reads as follows: "Any person alleging a

---

435 F. Supp. 2d 1237 (N.D. Ga. 2006); *Beebe v. Williams College,* 430 F. Supp. 2d 18 (D. Mass. 2006); *Canterbury v. Federal-Mogul Ignition Co.,* 418 F. Supp. 2d 1112 (S.D. Iowa 2006); *Sheaffer v. County of Chatham,* 337 F. Supp. 2d 709 (M.D.N.C. 2004); *Knussman v. State,* 65 F. Supp. 2d 353 (D. Md. 1999); *Lloyd v. Wyoming Valley Healthcare Sys., Inc.,* 994 F. Supp. 288 (M.D. Pa. 1998).

[10] *Collins v. OSF Healthcare Sys.,* 262 F. Supp. 2d 959 (C.D. Ill. 2003); *Keene v. Rinaldi,* 127 F. Supp. 2d 770 (M.D.N.C. 2000).

violation of sub. (2), (2m), or (2r), including the attorney general on behalf of an aggrieved person, may bring a civil action for injunctive relief, for damages, including punitive damages, and, in the case of a prevailing plaintiff, for court costs and reasonable attorney fees." We have been directed to no published opinion recognizing trial by jury under this statute. The statute refers specifically, in paragraph (c), to the *court's* power to issue a permanent or temporary injunction or restraining order and the *court's* power to order other relief "that the *court* considers appropriate, including monetary damages, actual and punitive." Wis. Stat. § 106.50(6m)(c) (emphasis added). In any event, as the *Humphrey* decision recognized, a civil action would be "in lieu of an administrative hearing," not a civil action with a jury trial after liability was determined in an administrative hearing without a jury. *See Humphrey,* ERD No. 9203044.

¶ 60. In sum, we are not only unpersuaded by the argument for an implicit statutory right to trial by jury but also concerned about the new precedent that would be created by such a holding for situations in which the legislature has been silent.

C. Claimed Constitutional Right to a Jury Trial

¶ 61. We turn now to Harvot's contention that she has a constitutional right to trial by jury to determine damages for her WFMLA claim.

¶ 62. Article I, Section 5 of the Wisconsin Constitution reads, in relevant part, as follows: "*The right of trial by jury shall remain inviolate,* and shall extend to all cases at law without regard to the amount in controversy . . . ." (Emphasis added.) This constitu-

25

tional provision preserves the right to a *civil jury trial*[11] "as it existed at the time of the adoption of the constitution in 1848." *Town of Burke v. City of Madison*, 17 Wis. 2d 623, 635, 117 N.W.2d 580 (1962).[12]

¶ 63. Our recent precedent firmly establishes a two-pronged test that governs the constitutional analysis regarding whether a particular statutory cause of action includes the right to a jury trial. *See Village Food*, 254 Wis. 2d 478, ¶¶ 11, 14, 16; *see also State v. Schweda*, 2007 WI 100, ¶¶ 20–21, 303 Wis. 2d 353, 736 N.W.2d 49; *McGrew*, 285 Wis. 2d 519, ¶¶ 18–19.

■

¶ 64. A party has a constitutional right, under Article I, Section 5, to have a statutory claim tried to a

---

[11] *See State v. Schweda*, 2007 WI 100, ¶ 17, 303 Wis. 2d 353, 736 N.W.2d 49; *Dane County v. McGrew*, 2005 WI 130, ¶ 13, 285 Wis. 2d 519, 699 N.W.2d 890; *Bennett v. State*, 57 Wis. 69, 74, 14 N.W. 912 (1883).

The right to a jury trial in criminal cases is governed by Article I, Section 7 of the Wisconsin Constitution. *Schweda*, 303 Wis. 2d 353, ¶ 17.

The Seventh Amendment to the U.S. Constitution does not apply in state courts. *See Village Food*, 254 Wis. 2d 478, ¶ 7 n.3 (citing *Pearson v. Yewdall*, 95 U.S. 294, 296 (1877)).

[12] *See also McGrew*, 285 Wis. 2d 519, ¶¶ 15–16, 18; *Village Food*, 254 Wis. 2d 478, ¶ 10 ("*[N]on-statutory* causes of action at law, where a jury trial was guaranteed before the passage of the state constitution, would continue to have a guaranteed right to a jury trial attached even after the passage of the constitution."); *Bekkedal*, 183 Wis. at 192 ("From an early day it was held that the constitutional provision preserving inviolate the right of trial by jury preserves that right inviolate as it existed at the time of the adoption of the constitution."); *Gaston v. Babcock*, 6 Wis. 490 (*503), 494 (*506) (1857) ("Again, this clause of the constitution provides that the right of trial by jury shall *remain* inviolate. We suppose this expression must have reference to the state of the law as it existed at the formation of the constitution . . . .").

26

jury "when: (1) the cause of action created by the statute existed, was known, or was recognized at common law at the time of the adoption of the Wisconsin Constitution in 1848 and (2) the action was regarded at law in 1848." *Village Food*, 254 Wis. 2d 478, ¶ 11. Although "[t]his court has been unanimous in concluding that the *Village Food* test is the correct test to apply in determining whether a cause of action gives rise to a constitutional right to a jury trial," the application of the test to particular causes of action "has not occasioned similar consensus." *Schweda*, 303 Wis. 2d 353, ¶ 21.

¶ 65. Most of our disagreement in applying the *Village Food* test relates to the first prong. For instance, the court in *Village Food* split four-to-three over whether a civil action for damages caused by a violation of the minimum mark-up law for gasoline satisfied the first prong of the test. *See Village Food*, 254 Wis. 2d 478, ¶¶ 33–36. The majority rejected comparisons to "business fraud, and torts such as cheating, fraud, deceit, and business slander" but concluded that the common law unfair trade practices of forestalling the market, regrating, and engrossing were "of the same 'nature' " as the cause of action under the minimum mark-up law. *Id.*, ¶¶ 23–25, 27, 31. The majority reasoned that "[t]hese offenses are clearly forerunners of modern unfair trade practice statutes, as each involves the prohibition of deliberate manipulation of market prices by a market participant in a controlled market." *Id.*, ¶ 27.

¶ 66. On the other hand, Justice Jon P. Wilcox, joined by Justices N. Patrick Crooks and Diane S. Sykes, was concerned that the majority's application of the first prong was too broad. *Id.*, ¶ 36 (Wilcox, J., concurring in part, dissenting in part). Specifically, Justice Wilcox made the following observations:

These offenses [of forestalling, regrating, and engrossing] are certainly forerunners of modern antitrust and unfair trade practice statutes in general, as each involves the artificial manipulation of market factors by a market participant. However, they are only similar to the present cause of action in that general sense.

. . . .

The simple fact that the present cause of action involves behavior that affects market prices is, in my opinion, simply not sufficient to show that the pre-1848 claims were substantially codified in a form as they existed then. In essence, the majority's holding is that the mere classification of the cause [of] action as an "unfair trade practice" is enough to constitutionally guarantee the right to a jury trial. This not only goes against our precedent, but essentially renders the test a nullity, as present causes of action of all sorts assessed under this test will only have to be compared generally to past causes of action in order to invoke the constitutional protection to a trial by jury.

*Id.*, ¶¶ 41, 46 (Wilcox, J., concurring in part, dissenting in part).

¶ 67. The disagreement over application of the first prong continued in *McGrew,* where the defendant sought a 12–person jury in his trial for speeding. *McGrew,* 285 Wis. 2d 519, ¶¶ 1–2; *see also* Wis. Stat. § 346.57(4)(h). A majority of four justices concluded that the defendant had a constitutional right to a jury trial. *McGrew,* 285 Wis. 2d 519, ¶¶ 3 n.2 (lead opinion), 70 n.1 (Bradley, J., concurring). The lead opinion did not agree. *Id.*, ¶ 3 (lead opinion).

¶ 68. The majority's conclusion regarding the first prong of the *Village Food* test was that general "laws of the road"[13] in existence in 1848 were "predecessors to

---

[13] The specific "law of the road" the majority of the court utilized for comparison reads as follows:

the 'rules of the road' violations recognized today," such as speeding. *Id.*, ¶¶ 60 (Bradley, J., concurring), 74 (Butler, Jr., J. dissenting). "Rather than narrowly focusing on each individual violation," the majority of the court "broaden[ed] its lens to focus on violations of the 'rules of the road.' " *Id.*, ¶ 57 (Bradley, J., concurring). By contrast, the lead opinion focused more narrowly on whether a speeding offense was in existence in 1848,[14] not simply a statute ordering a vehicle to "keep to the right side of the road." *See id.*, ¶ 30 (lead opinion).

¶ 69. More recently, in *Schweda,* the court split four-to-three with regard to whether a defendant charged with violating a number of waste disposal regulations had a constitutional right to a jury trial. *See Schweda,* 303 Wis. 2d 353, ¶¶ 3, 57 (Prosser, J., concurring in part, dissenting in part). The majority rejected the defendant's contention that the environmental regulatory violations being charged against him by the state were "analogous to common law nuisance claims." *Id.*, ¶¶ 2, 14. While the majority noted that "[t]here is no question that modern environmental law finds its roots in common law nuisance," *id.*, ¶ 31, it

---

Whenever any persons shall meet each other on any bridge or road, travelling with carriages, waggons, sleds, sleighs, or other vehicles, each person shall seasonably drive his carriage or other vehicle to the right of the middle of the travelled part of such bridge or road, so that the respective carriages, or other vehicles aforesaid, may pass each other without interference.

Wis. Stat. ch. 33, § 1 (1849). As Justice Louis B. Butler, Jr., noted, "In 1849, 'seasonably' was understood as meaning not done rashly or in haste." *McGrew,* 285 Wis. 2d 519, ¶ 75 (Butler, Jr., J., dissenting).

[14] In *McGrew,* all seven justices rejected the comparison of speeding to common law nuisance as being too broad. *See id.,* ¶ 25 (lead opinion).

refused to analogize the broad common law claim of nuisance to contemporary environmental regulations, *id.*, ¶ 40. The majority justified its conclusion on the fact that common law nuisance required a showing of harm, whereas harm was not an element in the environmental regulations at issue. *Id.*, ¶ 42 ("Thus, where such a vital aspect of a common law nuisance cause of action, i.e., harm, is not part of a contemporary cause of action, it is our determination that the two are not sufficiently analogous to pass the first prong of the *Village Food* test.").

¶ 70. Article I, Section 5 of our constitution reads, in part, as follows: "The right of trial by jury shall remain inviolate, and shall extend to all cases at law. . . . " If this provision were interpreted to read, "The right of trial by jury . . . shall extend to all cases at law," this court would concentrate on whether the modern statutory cause of action at issue *is* "at law." However, our precedent directs us to look backward to the time of statehood with respect to both prongs in the *Village Food* test. This makes application of Article I, Section 5 difficult to apply in statutory causes of action, where it is disputed whether a similar cause of action "existed, was known, or was recognized at common law at the time of the adoption of the Wisconsin Constitution in 1848." *Village Food,* 254 Wis. 2d at 478, ¶ 11.

¶ 71. Returning to the first prong, the majority in *Village Food* borrowed a word from the court of appeals decision in *Ameritech.* The word was "counterpart." Having established its two-part or two-pronged test, the court stated the following:

> The cause of action under the Unfair Sales Act involves allegations of a *similar* unfair trade practice [namely, "selling below cost"] . . . . The fact that the type of unfair trade practice prohibited at common law

30

*differs slightly* in its means from the unfair trade practice prohibited under the Unfair Sales Act is . . . an insufficient distinguishing characteristic to restrict a jury trial in this case. They are essentially *"counterpart[s]"* in combating unfair trade practices. *See Ameritech,* 185 Wis. 2d at 697.

*Id.,* ¶ 28 (emphasis added).

¶ 72. We believe it would be hard to show that a modern statutory cause of action is essentially the *counterpart* of a cause of action existing in 1848 if the two causes of action do not share a similar purpose. Hence, comparing the purpose underlying the modern statute to the purpose underlying its alleged common law counterpart will be helpful in applying the first prong of the *Village Food* test. *See Schweda,* 303 Wis. 2d 353, ¶ 34; *McGrew,* 285 Wis. 2d 519, ¶¶ 74–76 (Butler, Jr., J., dissenting); *Village Food,* 254 Wis. 2d 478, ¶ 27.

¶ 73. To illustrate, in *Village Food,* the purpose underlying both the minimum mark-up law for gasoline and the common law causes of action of forestalling the market, regrating, and engrossing was to prevent "deliberate manipulation of market prices by a market participant in a controlled market." *Village Food,* 254 Wis. 2d 478, ¶ 27. In *McGrew,* the contemporary rules on speeding and the common law "laws of the road" were designed for the same basic purpose: to facilitate safe and expeditious travel on the roadways. *See, e.g., McGrew,* 285 Wis. 2d 519, ¶¶ 74–76 (Butler, Jr., J., dissenting). In *Schweda,* a majority of the court appeared to find that common law nuisance and modern environmental regulations did not have the same purpose:

> Here, the causes of action are not essentially counterparts to the public nuisance actions that existed at common law. A cause of action for public nuisance requires a showing of substantial and unreasonable

31

harm to interests in the use and enjoyment of land. Under historic common law nuisance, a party should not seek recovery until an actual nuisance has been committed, or at all events until it is quite clear that the [conduct] will inevitably result in a nuisance. Modern environmental regulatory laws, however, regulate more subtle and attenuated harms than the common law of nuisance does; a land use that creates a common law nuisance is thus likely to be an a fortiori violation of statutory environmental law.

*Schweda*, 303 Wis. 2d 353, ¶ 35 (internal citations and quotations omitted) (alteration in original).

¶ 74.　Having said that, we think the court's decision in *Schweda* represents a narrowed application of the test in *Village Food*.

¶ 75.　In *Village Food*, the defendant was charged with violating the minimum mark-up laws in the sale of motor vehicle fuel. *Village Food*, 254 Wis. 2d 478, ¶¶ 1, 3. A competitor claimed that the defendant had violated the law on 103 different occasions. *Id.*, ¶ 3. The competitor sought $2,000 in damages for each violation and for each day of continued violation. *Id.*, ¶ 4. The defendant sought to present its defense to a jury. *Id.*, ¶¶ 3–4. In these circumstances, the court rendered a broad reading of the constitution.

¶ 76.　In *McGrew*, the defendant was convicted of speeding by a 6–person jury. *McGrew*, 285 Wis. 2d 519, ¶ 7. He argued that he had a constitutional right to a 12–person jury. *Id.*, ¶ 2. A majority of justices ruled that McGrew had a constitutional right to a jury but only one justice concluded that McGrew had a right to a jury of 12. *See id.*, ¶¶ 3 n.2 (lead opinion), 70 n.1 (Bradley, J., concurring), 72 (Butler, Jr., J. dissenting). Thus, the court essentially preserved the status quo.

¶ 77. In *Schweda,* a defendant asked for a jury trial on the state's complaint of multiple violations of environmental regulations, *Schweda,* 303 Wis. 2d 353, ¶ 1, resulting in forfeiture of $219,120 plus other costs, totaling $365,373.54, *id.,* ¶¶ 86, 86 n.12 (Prosser, J., concurring in part, dissenting in part). The court was unanimous that some of the violations had no pertinent counterpart at common law. *See, e.g., id.,* ¶ 57. It was divided on others. *Id.* The majority opinion amounted to a narrower interpretation of the *Village Food* test and the term "counterpart" than was evident in the two earlier cases.

¶ 78. In this case, we do not see any cause of action existing in 1848 as an essential counterpart, with a similar purpose, to a suit for damages for a violation of the WFMLA.

¶ 79. The purpose of the WFMLA was explained in *Kelley Co. v. Marquardt,* 172 Wis. 2d 234, 248, 493 N.W.2d 68 (1992). The WFMLA "sets forth minimum rights for family and medical leave." *Id.* The legislative history of the WFMLA reveals that the law was "intended to assist workers in handling conflicts between the demands of their work and the needs of their families." *Id.* at 248–49.

> The [WFMLA] was a response to the increased entry of women, the persons traditionally responsible for family care giving, into the work force. The [WFMLA] was designed to accomplish the following: make employees more productive on the job because they will have dealt with family crises while on leave; help ease the day care shortage; save health care costs by allowing children to care for seriously ill parents at home; and make bonding for new infants and adjustment periods for adopted children go easier which will have long term psychological benefits for children.

> The [WFMLA] is designed to protect employees'
> jobs and benefits while on leave to care for their
> families or their own medical needs.

*Id.* at 249 (internal footnotes omitted).

¶ 80. The WFMLA is modern social legislation. It may be viewed as fundamental today, but it was quite unheard of in 1848.

¶ 81. Harvot suggests the WFMLA entails labor standards and that labor standards of one sort or another have existed for centuries. This claim is too broad to be meaningful.[15]

¶ 82. Harvot points to Chapter 81 of the 1849 Wisconsin Statutes, which she asserts provided protection for apprentices in the case of cruelty by masters, failure of masters to educate apprentices, and breach of masters' duties to apprentices. Wis. Stat. ch. 81 (1849). The predecessor of this statute existed in the Wisconsin Territory. *See* 1838–39 Statutes of Wisconsin at 134–36.

¶ 83. This statute is not a counterpart of the WFMLA, as can be seen in Section 1, Chapter 81, which describes the relationship between master and servant:

> Section 1. Every male infant, and every unmarried female under the age of eighteen years, with the

---

[15] In *General Drivers & Helpers Union, Local 662 v. Wisconsin Employment Relations Board,* 21 Wis. 2d 242, 252, 124 N.W.2d 123 (1963), the court observed the following:

> [R]espondent's argument that it is being deprived of the right to a trial by jury . . . fails for the reason that the right which is constitutionally protected is the right which existed under the common law at the time our constitution came into being. . . . Since unfair labor practice litigation . . . was not in existence at the time that the Wisconsin [C]onstitution came into being, there is no constitutional obligation to afford a jury trial in such proceedings.

(Citing *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 48 (1937.))

> consent of the persons or officers hereinafter men-
> tioned, may, of his or her own free will, bind himself or
> herself in writing, to serve as clerk, apprentice, or
> servant, in any profession, trade, or employment, if a
> male, until the age of twenty one years, and if a female
> until the age of eighteen years, or until her marriage
> within that age, or for any shorter time; and such
> binding shall be as valid and effectual as if such infant
> was of full age, at the time of making such engagement.

Wis. Stat. ch. 81, § 1 (1849). The relationship between master and apprentice or servant in 1848 was very different from the usual employer-employee relationship today.

¶ 84. Harvot also points to Sir William Blackstone's *Commentaries on the Law of England,* especially "Chapter the Fourteenth," at 2 Commentaries 328, dealing with master and servant, as did Wis. Stat. ch. 81 (1849). She makes much of the following passage in Robert J. Steinfeld's book, *The Invention of Free Labor: The Employment Relation in English and American Law & Culture, 1350–1870* 31 (1991):

> The master was legally obliged to maintain his servant,
> as he was his apprentice, but servants were also en-
> titled to wages. Indeed, a master was obligated to
> continue to pay his servant's wages even "if a servant
> retained for a year, happen within the time of his
> service to fall sick, or to be hurt or disabled by the act
> of God, or in doing his master's business." Naturally, a
> master was not permitted to send such a servant away.

(Internal footnotes omitted.)

¶ 85. Superficially, this is the most analogous common law cause of action that Harvot presents. Unfortunately, she does not acknowledge that this common law cause of action was actually an action for the breach of an employment contract. *See id.* In fact,

the sentences immediately preceding the cause of action cited by Harvot state the following:

> *Whether by retainer for a year or by indenture,* once the oral agreement between master and resident servant had been assented to or the indentures had been signed, *the parties,* as in apprenticeship, *were bound by their undertakings,* both those explicitly stated and those implied by law.

*Id.* (emphasis added).

¶ 86. Consequently, the apparent purpose underlying this common law action for breach of a retainer agreement (employment contract) was to ensure that the servant (employee), who could be criminally prosecuted for departing before his term of employment was complete, was cared for and compensated as he was promised. *See id.* Assisting an employee to balance work and family demands was not a purpose of this common law cause of action. As a result, we cannot say that this common law cause of action for breach of an employment contract serves a purpose similar to that of Harvot's civil action for damages under the WFMLA. It is not a counterpart, and it fails to satisfy the first prong of the *Village Food* test. Moreover, the procedure Harvot seeks—a jury trial on damages *after an administrative finding of facts and liability*—also was not present in the 1840s.

■■

¶ 87. In conclusion, it would be hard to imagine that Harvot's civil action for damages under the WFMLA "existed, was known, or was recognized at common law . . . in 1848" when we consider that the creation of the WFMLA was a response to the change in composition of the modern-day work force. *See Kelley Co.,* 172 Wis. 2d at 248–49. Because we conclude that

Harvot cannot satisfy the first prong of the *Village Food* test, we hold that she has no constitutional right to a jury trial in her civil action for damages caused by a violation of the WFMLA.

## IV. CONCLUSION

¶ 88. We conclude that the WFMLA does not confer an implied statutory right to jury trial in a civil action to recover damages for a violation of the WFMLA. We further conclude that Article I, Section 5 of the Wisconsin Constitution does not afford the right to jury trial in a civil action to recover damages for a violation of the WFMLA. Consequently, we affirm the order of the circuit court.

*By the Court.*—The decision and order of the circuit court is affirmed.

¶ 89. ANN WALSH BRADLEY, J. (*dissenting*). At issue in this case is a narrow question: Does the Wisconsin Family or Medical Leave Act (WFMLA)[1] confer an implied statutory right to a jury trial? Despite the narrow focus of the question, the majority renders a sweeping determination. It holds that "when a statute is silent with regard to the right to a jury trial, no jury trial is required unless the right is preserved by Article I, Section 5 of the Wisconsin Constitution." Majority op., ¶ 47.

¶ 90. The majority warns that finding implied statutory rights to trial by jury would "open a can of worms." Majority op., ¶ 50. I conclude, however, that it is the majority opinion that opens the proverbial can of worms. Its sweeping proclamation calls into question the status of a host of jury trials in this state and misapprehends the law. Because I determine that there

---

[1] Wis. Stat. § 103.10(13)(a).

exists an implied statutory right to jury trial for WFMLA actions, I respectfully dissent.

I

¶ 91. The majority correctly observes that the WFMLA contains no express statement providing for a jury trial. Quoting language from three cases,[2] it concludes that when the statute is silent on the issue, the legislature necessarily meant for there to be no jury trial in a civil action.

¶ 92. Warning of dire consequences, the majority observes: "Asking this court to discover an implied *statutory* right to trial by jury in situations where the legislature has not prescribed such a right . . . would open a can of worms. . . . Ad hoc judicial discovery of implied *statutory* rights to trial by jury would not permit a meaningful legal test that could carry over from case to case." Majority op., ¶ 50 (emphasis in original).

¶ 93. After finding no implied statutory right to a jury trial, the majority proceeds next to examine whether the right to a jury trial can be found in the Wisconsin Constitution. Ultimately, the majority voices dissatisfaction with the established test for assessing the existence of a constitutional right, invents its own, and concludes that no right exists.

II

¶ 94. The majority's sweeping statement that there can be no implied statutory right to a jury trial calls into question the validity of a host of jury trials.

[2] *See Village Food & Liquor Mart v. H&S Petroleum, Inc.,* 2002 WI 92, 254 Wis. 2d 478, 647 N.W.2d 177; *Bekkedal v. City of Viroqua,* 183 Wis. 176, 197 N.W. 707 (1924); *State v. Ameritech Corp.,* 185 Wis. 2d 686, 517 N.W.2d 705 (Ct. App. 1994).

Although I have not done an exhaustive study, two examples readily come to mind. Wisconsin Stat. § 218.0171 (Wisconsin's Lemon Law) provides a remedy for an automotive dealer who fails to replace or refund a customer's purchase of a defective car. The remedial portion of the statute is silent on the issue of whether the action is to be tried to the court or to a jury:

> In addition to pursuing any other remedy, *a consumer may bring an action to recover for any damages* caused by a violation of this section. The court shall award a consumer who prevails in such an action twice the amount of any pecuniary loss, together with costs, disbursements and reasonable attorney fees, and any equitable relief the court determines appropriate.

Wis. Stat. § 218.0171(7) (emphasis added).

¶ 95. Despite the fact that the legislature did not expressly provide for a jury, Lemon Law cases have been tried to juries around the state for years.[3] Moreover, the Civil Jury Instruction Committee has drafted a special verdict form as well as a variety of pattern jury instructions for the trial by jury of Lemon Law cases.[4]

---

[3] See, for example: Brown County: *Schonscheck v. Paccar, Inc.,* 2003 WI App 79, 261 Wis. 2d 769, 661 N.W.2d 476; Dane County: *Dobbratz Trucking & Excavating, Inc. v. PACCAR, Inc.,* 2002 WI App 138, 256 Wis. 2d 205, 647 N.W.2d 315; Waukesha County: *Estate of Riley v. Ford Motor Co.,* 2001 WI App 234, 248 Wis. 2d 193, 635 N.W.2d 635; Clark County: *Gosse v. Navistar Intern. Transp. Corp.,* 2000 WI App 8, 232 Wis. 2d 163, 605 N.W.2d 896 (Ct. App. 1999); Sheboygan County: *Hartlaub v. Coachmen Indust., Inc.,* 143 Wis. 2d 791, 422 N.W.2d 869 (Ct. App. 1988); Fond du Lac County: *Creighbaum v. Mack Trucks, Inc.,* No. 1990AP1281, unpublished slip op. (Wis. Ct. App. Mar. 27, 1991).

[4] *See* Wis JI—Civil 3300; *see also id.* 3301 (Lemon Law Claim: Nonconformity); *id.* 3302 (Lemon Law Claim: Four

¶ 96. The Wisconsin Fair Dealership Law provides a second example. Wisconsin Stat. § 135.03 states that no grantor may "terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause." The statute also provides a remedial scheme that is silent on the issue of whether the action is to be tried to the court or to a jury:

> If any grantor violates this chapter, *a dealer may bring an action against such grantor in any court of competent jurisdiction for damages sustained* by the dealer as a consequence of the grantor's violation, together with the actual costs of the action, including reasonable actual attorney fees . . . .

Wis. Stat. § 135.06 (emphasis added). Nevertheless, there are numerous appellate decisions from around the state that reflect that the action was tried to a jury. Notably, the Wisconsin Civil Jury Instruction Committee has drafted a special verdict form and pattern jury instructions for jury trials under Wisconsin's Fair Dealership Act. See Wis JI—Civil 2769–2772.

¶ 97. It is unclear how the majority's sweeping pronouncement will affect the past judgments rendered and the future cases to be tried under Wisconsin's Lemon Law and Fair Dealership Act. Can past judgments be challenged? Should future cases be tried to a jury? What role, if any, should advisory juries play?[5]

Attempts to Repair: Same Nonconformity); *id.* 3303 (Lemon Law Claim: Out of Service Warranty Nonconformity); *id.* 3304 (Lemon Law Claim: Failure to Repair).

[5] Wis. Stat. § 805.02(1) provides: "In all actions not triable of right by a jury, the court upon motion or on its own initiative may try any issue with an advisory jury." Trial by advisory jury requires the consent of both parties. *Id.*, § 805.02(2).

What is clear, however, is that now that the majority opens this can of worms, we will be faced with untold litigation attempting to answer the questions raised by the majority's broad pronouncement.

### III

¶ 98. In addition to unsettling the status of these cases, the majority misapprehends the law. The Wisconsin cases the majority cites for the proposition that there can be no implied jury trial are not on point. *See Village Food & Liquor Mart v. H&S Petroleum, Inc.,* 2002 WI 92, 254 Wis. 2d 478, 647 N.W.2d 177; *Bekkedal v. City of Viroqua,* 183 Wis. 176, 197 N.W. 707 (1924); *State v. Ameritech Corp.,* 185 Wis. 2d 686, 517 N.W.2d 705 (Ct. App. 1994). None of the cases relied upon by the majority addresses the question of an implied statutory right to a jury trial. Rather, the issue addressed was whether a constitutional right to a jury trial can be found in the absence of an expressed statutory right.

¶ 99. Contrary to the majority, I ground my analysis in an interpretation of the statute and conclude that the WFMLA has an implied right to a jury trial in a civil damage action. A comparison between the WFMLA and the federal Family and Medical Leave Act (FMLA) supports this conclusion.

¶ 100. The Wisconsin Act and the federal FMLA contain a ‚similar remedial scheme and structure. Notably, like the Wisconsin Act, the federal act does not expressly provide for a jury trial in actions for damages based on violations of the FMLA. Nevertheless, federal courts have concluded that there is an implied right to a jury trial. *See Frizzell v. Southwest Motor Freight,* 154 F.3d 641 (6th Cir. 1998).

41

¶ 101. Like the Wisconsin law,[6] the federal law provides two distinct types of remedies: equitable relief and monetary damages:

(1) Liability. Any employer who violates [the act] shall be liable to any eligible employee affected:

(A) for damages equal to (i) the amount of (I) any wages, salary employment benefits, or other compensation denied or lost to such employee by reason of the violation; or (II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation . . . .

(B) for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

29 U.S.C. § 2617.

¶ 102. Federal courts have relied on the remedy scheme and structure to determine that there is an implied statutory right to a jury trial in an action for damages:

The distinction between "damages" and "equitable relief" reflects Congress's intent to make juries available to plaintiffs pursuing remedies that fall under section 2617(1)(A), while leaving it to the judge to determine

---

[6] The relevant language from Wis. Stat. § 103.10(12)(d) and (13)(a) is as follows:

[The Department] may order the employer to take action to remedy the violation, including providing requested family leave or medical leave, reinstating an employee, providing back pay accrued . . . and paying reasonable actual attorney fees . . . .

An employee . . . may bring an action in circuit court against an employer to recover damages caused by a violation of [the WFMLA] after the completion of an administrative proceeding, including judicial review, concerning the same violation.

whether equitable relief is warranted under section 2617(1)(B). While Congress's intent would be clearer if the FMLA included the word "legal" to label the damages available under 2617(1)(A), the FMLA's division between "damages" and "equitable relief" still indicates an intent to make juries available.

*Frizzell,* 154 F.3d at 643; *see also Arban v. West Publ'g Corp.,* 345 F.3d 390 (6th Cir. 2003); *Nero v. Indus. Molding Corp.,* 167 F.3d 921 (5th Cir. 1999); *Haschmann v. Time Warner Entm't Co.,* 151 F.3d 591 (7th Cir. 1998); *Bryant v. Delbar Prods., Inc.,* 18 F. Supp. 2d 799, 810 (M.D. Tenn. 1998); *Helmly v. Stone Container Corp.,* 957 F. Supp. 1274, 1276 (S.D. Ga. 1997); *Souders v. Fleming Cos., Inc.,* 960 F. Supp. 218, 219 (D. Neb. 1997).

¶ 103. Relying on the rationale of the federal courts, I determine that the creation of a separate cause of action for damages demonstrates that the legislature intended civil actions under the WFMLA to be tried by a jury. Therefore, I conclude that the failure to expressly provide for a jury trial in the WFMLA does not automatically negate that right. Rather, I determine that even in the absence of express language, there is an implied statutory right to a jury trial under the WFMLA.

IV

¶ 104. Although I need not address the constitutional arguments because I decide the case on statutory grounds, I pause briefly to comment on the majority's treatment of the established test for assessing the constitutional right to a jury trial in a civil action. The majority expresses dissatisfaction with the *Village Food* test and highlights the court's split decisions when applying the test: "Although this court has been unani-

mous in concluding that the *Village Food* test is the correct test to apply, . . . the application of the test to particular causes of action has not occasioned similar consensus." *See* majority op., ¶ 64 (quoting *State v. Schweda,* 2007 WI 100, ¶ 21, 303 Wis. 2d 353, 736 N.W.2d 49); *see also Dane County v. McGrew,* 2005 WI 130, 285 Wis. 2d 519, 699 N.W.2d 890; *Village Food,* 254 Wis. 2d 478.

¶ 105. Under the *Village Food* test, the court examines whether a statutory cause of action is "essentially [a] counterpart to," "sufficiently analogous to," and "of the same nature" as an 1848 action at law. *Schweda,* 303 Wis. 2d 353, ¶¶ 23, 41. The *Village Food* test can be easily manipulated, depending on the focus of the lens. We have disagreed over how broadly or narrowly to focus the lens when determining whether two causes of action are "counterparts."

¶ 106. In attempting to remedy this infirmity, the majority creates out of whole cloth a new test: "similar purpose." Majority op., ¶ 72. Yet, the majority's new innovation suffers from the same infirmity. How broadly or narrowly are we to construe the purpose of a cause of action? I predict that the majority's addition of "similar purpose" will lend no more consistency to our application of the *Village Food* test and instead adds but another layer of analysis.

¶ 107. Accordingly, for the reasons stated above, I respectfully dissent.

¶ 108. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.